**UNITED STATES of America**
**v.**
**Alfredo AVILES et al., Defendants.**

United States District Court
S. D. New York.
Dec. 22, 1961.

See also 197 F.Supp. 536.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, New York City (Jerome J. Londin, Herbert B. Greene, New York City, Ezra H. Friedman, Gerald E. Paley, Brooklyn, N. Y., of counsel), for plaintiff.

Edward Bennett Williams, Wilfred L. Davis, New York City (Robert L. Weinberg, Washington, D. C., of counsel), for defendant Vito Genovese.

Roy L. Reardon, New York City, for defendant Charles Barcellona.

Albert J. Krieger, New York City, for defendants Charles DiPalermo and Joseph DiPalermo.

Maurice Edelbaum, New York City, for defendant Natale Evola.

Wilfred L. Davis, New York City, Albert J. Krieger, New York City, of counsel, for defendant Vincent Gigante.

Abraham Brodsky, New York City, for defendants Nicholas Lessa and Daniel Lessa.

Henry K. Chapman, Irving Rader, New York City, for defendant Rocco Mazzi.

David Schwartz, New York City, for defendant Carmine A. Polizzano.

Allen S. Stim, New York City, for defendant Ralph Polizzano.

Herbert S. Siegal, New York City, for defendant Salvatore Santora.

THOMAS F. MURPHY, District Judge.

Defendants move for a new trial based on newly discovered evidence. The newly discovered evidence relied upon are certain notes taken or made by Assistant United States Attorney Shaw during interviews with the government's principal witness, one Nelson Silva Cantellops, in preparing for the examination of that witness before a grand jury. The moving defendants, among others, were indicted and ultimately convicted of criminal conspiracy to violate the Federal Narcotic laws after protracted trial by jury.[1] It is defendants' contention here that the notes in question were producible under the Jencks statute,[2] for use in cross-examination of the witness at the trial, and that the government unilaterally determined for itself that such notes were not within the purview of the statute and, accordingly, suppressed them and deprived defendants of their use to their prejudice.

While there is room for difference of opinion, we nevertheless will proceed upon the premise that production of the notes in question was adequately demanded by defense counsel,[3] and that the direction and orders of the trial court to either turn Jencks material over to counsel directly or to the court for *in camera* inspection also encompassed such notes, and that any fault for their nonproduction lies solely with the government. The defense attorneys were fully aware that Shaw had interviewed the witness approximately once a week during a period of time extending over six months; had taken notes during such interviews and had educed some 269 pages of grand jury testimony from the witness in eight days of interrogation before that body. Though not specifically mentioned by counsel, their demand was broad enough to encompass anything that would constitute a "statement" within the meaning of 3500(e), including the notes of an Assistant United States Attorney if such a person's notes are within the reach of the Act. The trial court's orders made it plain that it desired to inspect all material in respect of which a question under the Jencks Act was involved. The United States Attorney represented to the court that he had already turned over to defense counsel "the only statements that were taken that fall within 3500." Obviously the government did not consider that the

---

1. Movant's convictions affirmed, United States v. Aviles et al., 274 F.2d 179 (2d Cir., 1960), cert. denied 362 U.S. 974, 982, 80 S.Ct. 1057, 1058, 1059, 1068, 1071, 1073, 4 L.Ed.2d 1009, 1010.

2. 18 U.S.C.A. § 3500. That statute, in pertinent part, provides:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

\* \* \* \* \*

"(e) The term 'statement', as used in subsection (b) \* \* \* of this section

in relation to any witness called by the United States, means—

"(1) \* \* \*

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

3. Defendants argue that a blanket demand is contemplated and sanctioned by the Jencks Act. The government contends that a proper foundation and a specific demand is required. 18 U.S.C.A. § 3500(b). See U. S. Code and Adm. News, 85th Congress, First Session, 1957, pp. 1863–1866.

notes of any of the assistants could be producible under that statute as statements and it did not purport to turn them over to the court to determine relevance or to conduct a *voir dire* as to whether or not they were "in substance what the witness said."[4]

■ A preliminary troublesome problem that could possibly preclude defendants from predicating this motion on the non-production of Shaw's notes is that they were aware of the fact, at least seemingly so, that the only material turned over to the court for its *in camera* inspection were reports of Narcotic Agents,[5] and with such knowledge, defense counsel nonetheless did not make a specific demand for the assistant's notes or for a *voir dire* with respect thereto. They might have thought such notes no longer existed (though any doubt in that regard would have been readily dispelled by a simple inquiry) or perhaps did not believe themselves entitled to notes of that character under this relatively new statute. Whatever the reason for not requesting them specifically, or for their indifference or lack of appreciation of the problem to at least focus the issue, we hold their general request and the court's specific directions, fairly and jointly construed, encompassed Shaw's notes and, as we said above, we will therefore assume wrongful or negligent non-production on the part of the government.

The remaining questions to which we now turn are, (1) were the notes in fact producible, and (2) if so, were defendants prejudiced thereby, by failure to have impeachment use of them, to the extent that justice requires a new trial. Rule 33, Fed.R.Crim.Proc., 18 U.S.C.A. In resolving these questions we have read, and reread and compared, all of the notes and other material in the file submitted on this motion, including reports of Narcotics Agents relating to Cantellops testimony, all of the trial testimony of the witness Cantellops and the testimony of Shaw upon the post-trial hearing before Judge Bicks.[6] In addition, we have held a hearing and read the briefs submitted on this motion. All of the foregoing labors could have been avoided by the simple action of the government of turning over the notes to the trial judge for *in camera* determination. Although this was the practice approved re doubtful "3500 material" by the Supreme Court in Palermo a year later, it has for many years been the practice in the Second Circuit in doubtful "relevancy matters" to produce the materials for the trial court's determination *in camera*. See, e. g., United States v. Grayson, 166 F.2d 863, 869 (2d Cir., 1948); United States v. Beekman, 155 F.2d 580, 584 (2d Cir., 1946); United States v. Ebeling, 146 F.2d 254, 256 (2d Cir., 1944); United States v. Cohen, 2 Cir., 145 F.2d 82, 92 (1944); United States v. Krulewitch, 2 Cir., 145 F.2d 76, 78, 156 A.L.R. 337 (1944). Unilateral action on the part of the government in fairly doubtful instances cannot be condoned.

■ In determining whether Shaw's notes were producible, i. e., whether they are "statements" we apply the same standard applied by the trial court, and

4. It must be remembered that this was January, 1959, before the Supreme Court's opinion in Palermo v. United States, 360 U.S. 343, 354, 360–361, 79 S.Ct. 1217, 3 L.Ed.2d 1287, where it is indicated that any doubt should be resolved by the trial judge *in camera*. See also United States v. Thomas, 282 F.2d 191, 194 (2d Cir., 1960); United States v. Killian, 275 F.2d 561, 568 (7th Cir., 1960).

5. As stated in defendant's brief submitted on the motion before Judge Bicks, "However, the record is absolutely clear that the files turned over to the Court for purposes of compliance with the Jencks Act at trial were only those of the Bureau of Narcotics. This is all that the Government ever represented either at this hearing or at the trial."

6. The motion for a new trial was heard originally by Judge Bicks who presided at the trial. In an opinion Judge Bicks denied the motion in all respects except as to the matter *sub judice* which was left for future determination. United States v. Aviles et al., 197 F.Supp. 536 (S.D.N.Y.1961).

that is, "do they set forth in substance what the witness said." In that view we can immediately eliminate the typewritten chronology which manifestly was prepared by Shaw from additional sources other than the witness's interviews, at a much later time, and includes interpretations, impressions and interpolations; it is a general meshing of materials, and in the language of Shaw, to constitute a comprehensive and intelligible whole. It is a work product of the attorney that, although incorporating information from notes of Cantellops' interviews, cannot at all be said to be a substantially verbatim statement of that witness. In any event, the notes from which information was taken and incorporated into that chronology exist and if defendants were entitled to them and received them, they would not also be entitled to a transcription of them. No advantage would be denied defendants in that regard. See Rosenberg v. United States, 360 U.S. 367, 370, 377, 79 S.Ct. 1231, 3 L.Ed.2d 1304.

■ Proceeding then, to a consideration of the handwritten notes of Shaw we find that the great majority of them are probably Jencks "statements" and that a *voir dire* by the trial judge would have resulted in the government being ordered to turn them over to defense counsel. However, with the exception of certain notes entitled, "Re. Conversation with Nelson Cantellops on October 10, 1957." and "10/11/57" (stapled together in one group), we find that virtually the entire contents of Shaw's notes correspond with the grand jury testimony of Cantellops which was turned over to the defense. As a matter of fact those notes were used by Shaw in presenting this witness's testimony to the grand jury. Defendants, in effect, already had what the notes contain and consequently no prejudice resulted to defendants from their non-production. Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304; Killian v. United States, 82 S.Ct. 302; United States v. Annunziata, 293 F.2d 373, 383 (2d Cir., 1961).

■ We come finally to the October, 1957, notes, mentioned above, and in our opinion, upon their non-production, defendants' motion for a new trial stands or falls. Up to this point we have not discussed the question of whether or not notes of an Assistant United States Attorney are subject to production under the Jencks Act; we have just assumed that to be so, supra. Now, limiting ourselves to the particular character of the notes in question we hold them to be producible. A convenient point of departure in our reasoning in so holding presents itself in the fact that the two statements turned over to defense counsel by the government in this case, without first submitting them to the court, and turned over without any contention at all that they did not fall unquestionably under the reach of § 3500, were two "Q & A's" of the witness Cantellops, one of which, coincidentally, was taken by Shaw. These of course were recorded verbatim by a stenographer simultaneously with the questions and answers. If in place of the stenographer we have the assistant taking down the questions and answers verbatim, in shorthand or word for word in longhand, logically such notes would be no less producible per Jencks. And since that statute requires production of statements if only "substantially verbatim" and recorded but "contemporaneously," then so long as such a statement is relevant to the direct testimony of the witness it would be producible under the statute notwithstanding that it were written or recorded by a government attorney, at least if taken during the investigative stage of the case as here, as distinguished from notes made in preparation for trial. Cf. United States v. Crosby, 294 F.2d 928, 951 (2d Cir., 1961); United States v. West, 170 F.Supp. 200, 209 (N.D.Ohio 1959) aff'd 274 F.2d 885 (6th Cir., 1960).

These October, 1957, notes were therefore producible if they contained "in substance what the witness said," there being no question here but that they were in fact contemporaneously written by Shaw. From the beginning to the end

of these particular notes they are written in the first person and they contain numerous quotes for responses or questions of third persons with whom Cantellops apparently narrates he was conversing. This, together with the very "flavor" of the notes, and bearing in mind Shaw's testimony at the post-trial hearing, *inter alia*, as to the difficulty of taking a statement from Cantellops, constrains us to conclude (and no *voir dire* seems necessary for us to so find) that these notes would be found by the trial court to be, and are in fact, substantially verbatim statements, and of course, relevant to Cantellops' trial testimony on direct examination. The difficult issue here is that of prejudice, for the notes most assuredly should have been produced pursuant to § 3500.

■■■ Defendants rely on United States v. Consolidated Laundries Corp., 291 F.2d 563 (2nd Cir., 1961). It is their contention that that case compels us to hold that they were prejudiced as a matter of law and that justice requires they be granted a new trial. To begin with, we observe that Consolidated Laundries involved the denial to defense of access to certain corporate documents consisting of correspondence, financial data and contracts, discovery of which they were entitled to by reason of a pretrial order as well as a direction by the trial court during trial to turn over to them all such materials. The documents were not "statements" within the purview of Jencks and the Court of Appeals did not discuss that statute in its opinion. The "suppressed" documents were material to the defense and not merely for impeachment purposes. The facts of that case were materially different than here and provide an additional reason for us to hold that authority not controlling upon our determination in this instance. According to· defendants' argument we should have no occasion to inquire into what use could have been made of the October notes or how they could have assisted the defense. In Consolidated Laundries the Court of Appeals discussed the relevance of the· documents

"suppressed," their usefulness to defendants on trial, and analyzed the type of witness Ullman was, with respect to whose testimony the documents were supposedly to be used most effectively. In our opinion, in the case at bar the test is not merely that something was denied defendants that they would have been entitled to use for impeachment purposes; we believe the essential question involved where, as here, defendants have in fact been denied access to Jencks material to which they were entitled is whether the defendants' cross-examination of the government witness was unduly restricted. Cf. United States v. Crosby, 294 F.2d 928, 950 (2d Cir., 1961). An inquiry such as made by the Court of Appeals in Consolidated Laundries is quite appropriate in resolving the problem. And while this question can probably rarely be answered in the negative without grave doubts, we feel confident that we are presented here with that rarity so that we can state, under the circumstances, that defendants would not have been materially aided, that denial of access to the notes in issue did not influence the result, and that, in sum, their cross-examination was not unduly restricted. The October notes contained materially false versions of two of Cantellops' trips, one to Las Vegas and one to Miami, both at the instigation of defendant Ralph Pollizzano and "Conrad De La Cruz." Cantellops' statement taken by Shaw and turned over to defendants was also dated October 10, 1957, and it too was false in the same respect as the notes except that it was limited to the Miami trip and except that the notes expanded on the facts more than the statement turned over. At the trial Cantellops was confronted on cross-examination by defense counsel with his July, 1957, and March, 1958, grand jury testimony as well as the October 10, 1957, statement, all of which were admitted by him to be false in material respects. Cantellops explained, and apparently to the satisfaction of the jury, that by ·relating a prearranged plan or understanding with defendants whereby,

if he were arrested he was to stall for time, to tell any story until defendants could get him released on bail or at least get legal assistance to him. Cantellops testified that he put that plan into operation when the federal government began to investigate him in 1957–1958. His perjurious grand jury testimony was supposedly in pursuance of that arrangement; it was given at a time, according to him, when he was not cooperating with the government. "The jury was fully advised of how Cantellops told his story to government agents and the United States Attorney, of his several appearances before the Grand Jury and the changes and modifications in his testimony there." (United States v. Aviles, 274 F.2d 179, 190 (2d Cir., 1960)). The jury gave credence to Cantellops' trial testimony notwithstanding his admitted prior perjury. If that were all it would still be difficult to see how an additional instance of fabrication, not under oath and at a time, consistently, when he was not yet cooperating with the government, could persuade the jury differently. But that is not all, for this witness was subjected to a most complete and searching cross-examination by able and experienced counsel during a period of 14 trial days, in the course of which his character and credibility were thoroughly explored and devastatingly attacked. The facts of his considerable prior criminal activities, his affliction with a loathsome disease, his immorality, his perjuries and his motive to misrepresent were all paraded before the jury without quarter. To be able with the use of the October notes to show that Cantellops spoke untruthfully on yet another occasion which he would undoubtedly admit and readily explain again as in accordance with the prearrangement to stall, etc., would simply add umber to an already blackened witness. Surely in the eyes of the jury "shade to shade [would] come too drowsi-ly." It is probable that the point of diminishing returns had already been reached in the impeachment of Cantellops. Mindful of the Supreme Court's admonition in Rosenberg (supra, 360 U.S. at 371, 79 S.Ct. at page 1234) that a "court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled," nevertheless, in the context of this long trial and in view of the fact that the witness's credibility had been so exhaustively explored we hold that the failure to produce Shaw's notes was not prejudicial to defendants.[7]

Perhaps the following narration may be helpful for a clearer appreciation of the relation, sequencewise, that the October notes bear to relevant circumstances surrounding the changed attitude of Cantellops to cooperating with the prosecution. Cantellops was arrested April 30, 1957, by New York law enforcement officers for selling narcotics. He was released on bail and then arrested again July 1, 1957, for another sale of narcotics and held without bail. Two New York State indictments for the above offenses were pending against him when he was questioned by federal agents while he was imprisoned in the Tombs. Additionally, a United States Commissioner's warrant issued on July 24, 1957, charged him with a federal narcotic violation and was served on him in the Tombs. He ultimately admitted to the agents his participation in federal narcotic violations together with other named persons. He did not tell the whole truth however, and did not implicate all of the defendants by any means. He began testifying before the federal grand jury on July 30, 1957, and as we said earlier, he later admitted perjury in that period. There then was a lapse of almost seven months until his next appearance before the grand jury on

---

7. Cf. United States v. Zborowski, 271 F.2d 661 (2d Cir., 1959); Kyle v. United States, 297 F.2d 507 (2 Cir., 1961), where Judge Friendly demonstrates the varying standard for the application of the harmless error doctrine, and reciprocally the varying standard as to the required showing of prejudice depending upon the peculiar facts and circumstances of the case.

718

March 17, 1958, at which time he was, according to him, cooperating. Actually, he was not even then telling the whole truth, as he admitted on cross-examination, and it was not until the end of June, 1958, that he implicated defendants Gigante and Genovese, explaining that until then he feared those defendants too much to do so. In the meantime however, following his July, 1957, grand jury appearance, he entered a plea of guilty in the New York Court of General Sessions to the crime of attempted felonious possession of narcotics, which plea was accepted to cover the two indictments outstanding. The questioning of Cantellops continued and investigation of leads developed therefrom went forward. On November 26, 1957, Cantellops was sentenced in the Court of General Sessions to a term of 3 years, 9 months to 4 years, 6 months. For a second felony offender it was a comparatively light sentence, and the judge who imposed it expressly noted that he was giving favorable consideration to the cooperation of Cantellops with the authorities. He went to Sing Sing Prison and very shortly thereafter he was brought back for further questioning by federal agents. That questioning continued and he was retained here in the city until after the trial. Three months after defendants were convicted, almost solely upon his testimony, Cantellops was freed when the Governor of New York State commuted his sentence at the request of the United States Attorney because of his assistance to the government in the prosecution.

Except for the commutation of his sentence, the jury was fully apprised of the above, although they were aware that Cantellops naturally hoped for favorable consideration in the light of his testimony for the government. The witness was an admitted accomplice in the very crime charged and the trial court scrupulously cautioned the jury with respect to accomplice testimony in its charge. In context, we conclude that an inconsistent fragment of the whole story, given at an early stage of the investigation by a then reluctant witness with a potential "life" sentence hanging over him as a second felony offender in the State court, with nothing apparently to gain by full disclosures to the government officials which would involve implicating numerous defendants whose enmity would endanger his life, would not have materially assisted defendants.

The motion is accordingly denied but the United States Attorney is ordered to turn over to defense counsel copies of the October 10–11, 1957, notes. All other notes are ordered sealed.

This is an order. No settlement is necessary.