**UNITED STATES of America,**
**Plaintiff,**

v.

**Robert Dewey HILBRICH and Nicholas Jacop Uselding, Defendants.**

**No. 62 CR 625.**

United States District Court
N. D. Illinois, E. D.

July 20, 1964.

James P. O'Brien, U. S. Atty., John Peter Lulinski, Chief Asst. U. S. Atty., Appellate Div., John Powers Crowley and William O. Bittman, Asst. U. S. Attys., for the United States.

Robert A. Helman, Chicago, Ill., for appellant Hilbrich.

George L. Saunders, Jr., Chicago, Ill., for appellant Uselding.

CAMPBELL, Chief Judge.

This case is now returned to me pursuant to a remand order by the Court of Appeals. The remand order recites that the mandate was issued in accordance with the suggestion of government counsel. By the mandate it is:

"ORDERED that the district judge who presided over the trial conduct an inquiry pursuant to 18 U.S.C. § 3500 directed to the existence of any notes of Government counsel related

to interviews with Government witnesses and of any statements of such witnesses taken by Government agents, and if they are determined to have existed, to conduct further inquiry as to whether they constitute statements under § 3500, and if they are statements, whether it was prejudicial to the defendants not to have received them; also to inquire into the destruction of any such statements if such destruction occurred; to make findings of fact on all those issues, and to have certified to this court the record of such inquiry and findings."

The defendants herein were, during April of 1963, before me tried by jury and found guilty of armed robbery of a Federal Insured Savings and Loan Association. They were represented at the trial by Jerome Rotenberg, Esq., and Martin Gerber, Esq., respectively. I appointed counsel of such prominence and ability because of their criminal trial experience and excellent reputation as members of the Bar of this Court. The government was equally well represented at the trial by Assistant United States Attorney William O. Bittman, a veteran of many criminal trials, ably assisted by Assistant United States Attorney Douglas Brown.

By the wording of the mandate I am now directed to " * * * conduct an inquiry pursuant to 18 U.S.C. § 3500 * * * " (hereinafter referred to as the Act). Inasmuch as the Act, commonly referred to as the Jencks Act, does not specifically provide for such inquiry procedure[1] I must read and interpret the mandate as having reference to the *"is it or is it not a statement"* procedure referred to and approved by the Supreme Court in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959) and Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961).

At the onset of this memorandum I wish with all respect to express my opinion that the *in camera* inquiry I have conducted pursuant to the mandate was from the record clearly unnecessary and the request of Government Appeals Counsel therefor thoroughly unwarranted and an imposition upon the Court of Appeals and this Court. In obedience and respect to the Court of Appeals I of course did conduct the inquiry ordered.

I called as witnesses the four attorneys who took part in the actual trial. I questioned them under oath, *in camera,* and caused a transcript of their testimony to be prepared, which transcript I tender herewith respectfully to the Court of Appeals. Copies of the transcript and of this Memorandum are also being sent to the United States Attorney and to defendants' appellate counsel.

*Findings of Fact and Conclusions of Law Pursuant to Mandate.*

 From the *in camera* testimony of the participating trial attorneys, the transcript of the trial and by longhand trial notes recorded in a bound volume at the time of the trial, I now make the following findings and conclusions in accordance with and in answer to the Mandate:

Neither prior to nor at the time of trial were there in existence " * * any notes of Government counsel relating to interviews with Government witnesses * * * ". Although some of the witnesses called by the government during the trial were in fact interviewed by one or both Assistant United States Attorneys, there were no notes taken at the time of or subsequent to such interviews.

Prior to and at the time of trial there were not in existence " * * * statements of such witness taken by Government agents * * * " which had not, prior to trial and

---

[1]. As will be more fully developed later in this Memorandum sub-section (c) of the statute does specifically provide for *in camera* inspection of statements which it is contended by the government are not "related to" the witnesses' testimony.

pursuant to my ruling been turned over to counsel for the defendants. (In this regard I understand and interpret the term "statement" to mean § 3500 statements as this term is defined in sub-section (e) thereof. By "such witnesses" I understand and interpret the Court to have reference to witnesses called by the government at the trial).

At the time of trial what might have been original § 3500 statements which were taken of many of the government witnesses by agents of the Federal Bureau of Investigation were no longer extant. These statements I learned at the trial had in each instance been destroyed by the agent who conducted the interview subsequent to his reducing the same to a full written statement known as an "interview report" and produced at the trial for defendants. Such destruction of the interview notes I find was in accordance with good business and office practice and was a procedural policy of the Federal Bureau of Investigation. It was not done in bad faith or with the intention or result of denying the instant defendants any rights they might otherwise have had pursuant to § 3500. The interview reports were "copies" (Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 hereinafter referred to as Campbell II) of the interview notes and as such were § 3500 statements and all such reports were pursuant to my trial order fully delivered to the defendants as is clearly evident from a reading of the trial transcript.

The foregoing findings clearly do not warrant a further finding as to the possible existence of "harmless error". However, if they should be so construed I do hereby conclude as a matter of law that any non-production of the agents' original notes due to their matter of course destruction would fall within the Rosenberg "harmless error" rule. (Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304). Briefly stated the rule is applicable in situations such as this where although related Act notes are not turned over in compliance with a proper defense motion, said failure of compliance is "empty of consequence" in that "no relevant purpose could have been served" and "no advantage to the petitioner was denied by witholding it"; e. g. where "the very same information was possessed by defendant's counsel or would have been available were error not committed". See also United States v. Thomas, 2 Cir., 282 F.2d 191 (1960).

Upon careful reflection and study of the transcript it becomes painfully apparent to me that the Assistant United States Attorney in making his aforesaid suggestion to our learned Court of Appeals was either ignorant of the record or deliberately misled that Court. I prefer of course to choose ignorance rather than venalty. However, I cannot condone and let go unmentioned such inadequate representation of the government before so important a tribunal. I am sure that our present United States Attorney who was not in office at the time of this appeal will see to it that this does not happen again.

I resent and here protest the inference of government appeal counsel that as the trial judge I did not satisfactorily or accurately discharge the duty imposed upon me by this Act.[2] I protest further the imposition by the same counsel upon our learned Court of Appeals, in permitting that Court to assume as it had every right to expect, that it was being well

2. "It would bespeak a serious reflection on the conscience and capacity of the federal judiciary if both a trial judge and a Court of Appeals were found to have disregarded the command of Congress, duly interpreted, for making available a prior statement of a government witness in a case." Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

advised by him as to the facts and the law. Clearly such is not the situation here.

All of the findings required to be made by the mandate and made herein had already been made and were to be found within the trial transcript. It is quite possible of course that my rulings at the time of trial were improper and not in keeping with a higher tribunal's more accurate appraisal of the state of the law, but nonetheless the findings now requested and conclusions thereon were made (and are, I believe, factually supported by the record.) If I was in error, I am sure the case will be duly reversed and remanded. However, the facts I am now required to determine have already been determined and are to be found in the transcript of the trial.

In support of the foregoing and to classify this apparent obfuscation of the record by the Assistant United States Attorney, I deem it appropriate here to do what he should have done and call the Court of Appeals attention to the following facts. As to the existence of any interview notes, supposedly taken by government counsel in interview with government witnesses, every government witness, without fail, who answered affirmatively when asked if he or she was interviewed by the Assistant United States Attorneys testified that the Assistant United States Attorneys *did not take any notes*.[3] The reason for such emphatic denial of note taking by all of the witnesses is understandable in light of the Assistant United States Attorney's practice of calling this fact—i. e. that no notes are being taken—to the attention of prospective witnesses at the time of interview.[4]

In addition to the testimony of the witnesses, Assistant United States Attorney Bittman (trial transcript p. 1424) made the buttressing representation in open court that although he and Brown did, as the witnesses testified, interview witnesses, they reduced nothing from these interviews to writing. Defendants' counsel in no way questioned or raised issue with the testimony of the witnesses or the representation of the Assistant United States Attorney.

■ Although the instant record contains witness testimony which is in addition to and in corroboration of government counsels' representations, I am of the opinion that such representations even standing alone without supporting testimony, if unquestioned by the defense would justify a finding. I am of course familiar with our Seventh Circuit's decisions in United States v. Collier, 313 F.2d 157 (1963), and in United States v. Keig, 320 F.2d 634 (1963). In Collier at page 159 of 313 F.2d the court stated: "It was not enough to take the representation of the Government attorney based on what the Bureau or agents had told him." However, a representation by an Assistant United States Attorney that he did not take interview notes is vastly different from his representation as to what someone else told him. To follow each representation during a trial by having an attorney sworn as a witness and made to repeat such representation lends no additional credence to his original statements. Such a requirement would in my opinion not only unduly burden crowded trial courts but would be an insult to the practicing trial bar all of whom took a most impressive oath upon first becoming officers of the court.

In Keig, the Court cited Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256, as follows: "The court should not make a final disposition upon the representation of government counsel. It cannot escape its duty to learn the truth first hand." In using this language the Supreme Court was referring to itself and was commenting on the situation before it; a representation made to an appellate tribunal, by appellate counsel which was not made to the

3. See the trial transcript relative to the following government witnesses: Sahs p. 198, Laskowski pp. 222, 6–9, Stubbe pp. 45–6–7, Burrei p. 426, Gregory p. 446.

4. See testimony of Assistant United States Attorneys found at p. 9 of their inquiry examination transcript.

trial judge and was not to be found or in any way substantiated in the trial record. The Court observed that the other party, not the Court, need not accept this representation, and if refused as it there was, that Court could make no finding thereon.

In this regard I call attention to some appropriate language appearing in Justice Frankfurter's dissent in Campbell "I", wherein in discussing the destruction issue and in part anticipating the Court's later decision on this issue in Killian, he stated at page 103 of 365 U.S., at page 431 of 81 S.Ct.:

> "It surely is not the duty of a district judge to investigate a response by one who is an officer of the court as well as of the United States on the assumption that he has intentionally or irresponsibly violated his responsibility to the court and the Government in conducting the Government's case in a manner consistent with basic legal ethics and professional care."

In the majority opinion in Clancy Justice Douglas in commenting upon representations made for the first time by government's appellate counsel said:

> "Moreover, the Government's assertion is not *a positive statement of the prosecution*. Those who present the case here say with candor that they speak only 'according to our information,' which admittedly *falls short of an assertion* that the copies were delivered to the defense at the trial." (emphasis added).

I suggest that those who are of the view that a trial judge may not make a finding upon the basis of an unquestioned representation by one of the attorneys as to a matter within his knowledge ask themselves · to what Justice Douglas referred when he used the phrases "positive statement of the prosecution" and "an assertion". Moreover, in the sentence immediately following the above quotation, emphasis is placed upon the fact of the defendants accepting or rejecting a representation. The Court stated that it could not accept the representation "(s)ince the defense earnestly denies * * *" it. See also Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

To preclude a trial court from accepting unopposed representation of trial counsel as to matters properly within his knowledge would render totally impractical any attempt to satisfactorily administer this Act.

It is palpably clear from a reading of the trial transcript that I was satisfied that the witnesses' testimony and the representation of government counsel were accurate and truthful and that there never existed any such interview notes as government counsel on appeal now seems to imagine. Moreover, my review of the trial record occasioned by this mandate, and my questioning of the trial attorneys, has in no way caused me to change my mind—rather, this hindsight has supported my earlier findings. It is quite apparent, for that matter it is obvious from the record, that there were and are no such interview notes in existence.

It has been suggested to me as a possible explanation of his unusual and unwarranted conduct therein that the Assistant United States Attorney who represents the government on the appeal of these cases may have been somewhat unduly concerned with my reference [5] to the "handwritings or notes" of the trial attorneys. Although it is clear to me that this distinguished counsel could not possibly have read the record and still make the representation he did to the Court of Appeals nevertheless I should observe that the transcript clearly shows my having ruled that said "handwritings or notes" (" * * * notes (made in) preparation for this case") were not Act statements and need not be turned over to the defendants.[6] I will acknowledge that a consideration and evaluation of

---

5. Pp. 141–2 of trial transcript.

6. See Legislative History p. 1867 as to " * * * unusual demands for produc-

this ruling in vacuum, without conferring with the trial attorneys in his own office or even more culpably without reading the related portions of the trial transcript, might upon a hypercritical appraisal by government appeal counsel of the record lead to some ambiguity. However, when properly considered [7] in light of the testimony of the witnesses who proceeded and followed my ruling (—that there were no "interview notes" taken by the Assistant United States Attorneys) followed by my deliberate failure to foreclose defense inquiry into the subject of the possible existence of "interview notes", and finally, when consideration is given to the broad language of the request motion being ruled on,[8] (in addition to notes and writings, memoranda, documents and most importantly, statements) it should be patently apparent that I was not ruling gratuitously and excluding the production of non-existing statements.

The suggestion of government's appeal counsel incorporated into the mandate that there might have existed, at the time of trial, Act statements that were not disgorged in accordance with my ruling is by nature most difficult if not impossible to now reconsider. In making this observation I wish to make it clear that

I intend no disrespect to the court of Appeals for, I am sure that if government counsel before it had as he should have done fully apprised that court of the trial record it would not have deemed further inquiry into this subject necessary.

My trial rulings relative to Act requests were, when considered in light of the entire record, clear and emphatic. With the exception of the already referred to "handwritings and notes" of the Assistant United States Attorneys made solely in the preparation of their personal trial briefs, I ordered turned over " * * everything that you have on each witness * * * " (Trial Transcript p. 141).

I had no reason then (see Trial Transcript pp. 601 and 859) nor do I have any now to believe that my rulings were not properly complied with. More important, the trial transcript and my most recent inquiry examinations failed to disclose any possible indication that full compliance was not attained. Under such circumstances I fail to appreciate the presumptious suggestion of the Assistant United States Attorney conducting this appeal that further inquiry into proper and adequate compliance by his fellow assistants is now necessary.

---

tion * * * " which " * * * illustrate the boldness of the attempts to enlarge the decision." One such illustration occurring where "the defense demanded the notes made by the assistant United States attorney in preparing his case for trial."

7. Judge Win Knoch dissenting in the most recent (April 22, 1964) and as yet unrecorded case of United States v. Allegretti et al., Nos. 13915–18, succinctly sets forth this requirement where at page 1 he states: "The comment made by the District Judge in his ruling upon the pending objections must be weighed in the light of the whole record, * * * ". Also, earlier at page 9 the learned Judge appropriately states that " * * * the ruling in question is not an isolated incident * * * ".

8. Trial Transcript pp. 137–8: "The request I am going to make, if the court please, pursuant to Section 3500 of Title 18 of the United States Code, is that the

government first of all be required to furnish the defendant, Nicholas Jacop Uselding, the thing counsel has told me that he wishes to join in this motion for Hilbrick, to furnish us with any and all notes, memoranda, writings, documents or statements which may be in the possession of the government which pertain to the testimony of these witnesses, or which were reduced to writing by those agents or Assistant United States Attorneys or other employees of the government who may have interviewed these people and thereafter committed to writing substantially that which was the subject matter of those interviews, that they turn these things and all documents or writings of those interviews containing anything concerning the past statements of any of these witnesses over to the defendants for inspection and possible use for impeachment, or further impeachment of the testimony of these witnesses."

The mandate's final requirement that I " * * * inquire into the destruction of any such statements *if such destruction occurred"* (emphasis mine) is the clearest indication that the Court of Appeals was misinformed as to the trial record. The testimony of Federal Bureau of Investigation Special Agents Kotsas, Hall and DuMaine is replete with references and statements to the effect that they did destroy original notes after writing reports. Moreover, with commendable, albeit expected, candor, in an obvious attempt to abide by the spirit as well as to the letter of my rulings on these issues, Assistant United States Attorney Bittman represented to the court that although such interview notes had been in existence there were none extant at the time of trial. (Trial Transcript p. 138)

Inquiry into the circumstances surrounding the various incidents of destruction brought forth the fact that at the time the agents interviewed prospective witnesses they took longhand notes of the witnesses' remarks. A short time thereafter, on the basis and with the aid of these interview notes, they dictated interview reports. After comparing the interview reports with the interview notes and determining that they were substantially similar,[9] they destroyed the interview notes as a matter of practice in accordance with the policy of their office. The interview reports, as the record indicates, were turned over to the defendants and the interviewed witnesses who were the original source of the information contained in the interview reports were properly cross-examined and subjected to possible impeachment thereon.

On the basis of this testimony I was satisfied that interview note destruction was not in bad faith and in contravention of the Act. I was then of the opinion—and on the basis of their recent inquiry testimony I am now certain—that defendants' counsel were equally well satisfied the destruction was not in bad faith. (Inquiry Examination Transcript; Gerber pp. 16–17, Rotenberg pp. 8, 9.) Neither of the defendants nor myself deemed it necessary to inquire further into the agents' motivation at the time they destroyed the interview notes. Impliedly I found the instances of destruction to have been in good as opposed to bad faith. Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

I respectfully tender the foregoing together with the transcript here attached in compliance with and obedience to the Mandate of the Court of Appeals.

## THE JENCKS ACT IN APPLICATION

For my own guidance in the future and for the assistance of the United States Attorney's office in cases hereafter before me, I would like now to take advantage of this opportunity to here record my own observations as to the administration of the Jencks Act.

Considered most generally the Act requires the Government, after[10] it has had a witness testify on direct examination in a criminal case, to, upon motion of the defendant, produce for de-

9. In light of the expressed language in Palermo and the obvious conclusions to be drawn from a reading of the second Campbell decision it should be quite apparent from a review of the transcript that my actions in ordering the Interview Reports turned over amounted to a finding that the Interview Reports were the witness' own statement—or rather as the Court said in Campbell a "Copy" of the witness's statement; that which is "almost ipissima verba" the statement. This fact had a profound influence on my determination that the interview note destruction was not in bad faith.

10. In the instant trial, as in all other criminal trials, I asked the government to turn over the statements prior to the witness testifying and in sufficient time to permit defendants' counsel to review the statements before the witness testifies. I usually suggest that at the end of the trial day statements be turned over relative to witnesses scheduled to testify the following day. I well realize that the Act does not require such premature turn-over and that the government would legally be well within its rights to object to and refuse my request. Both in fairness to defendants

fendants use any and all statements of such witness in the possession of the government.

During the course of trial legal and factual issues relative to the Act might arise under what I consider to be two distinct areas of consideration. Initially, the trial judge might be presented with what I call an "is it or is it not a statement" question. Or, the trial judge might have before him a subsection (c) "related to" issue—i. e. does the statement relate to the subject matter of the witnesses testimony? Unfortunately the law applicable to these two separate questions has not always been appreciatively distinguished.

■ The Act specifically requires a defendant to move for the production of Act statements. Generally, I suggest, that where such a motion does not result in the government's producing statements, or in its failing to turn over what the defendant feels are all of the statements properly producible, if the witnesses testimony has in no way suggested the possible existence of such statements, then via cross-examination defendant must bring out from the witness (or possibly another witness called on this issue) some indication or possibility that a further statement might exist. Absent such a showing by failing to lay a proper foundation the trial judge's threshold obligation to administer the Act could not and would not be called into play. The Legislative Committee Reports (U. S. Congressional and Administrative News—85th Congress—First Session—1957 Vol. 2—Legislative History p. 1861, 1865–6) relative to the Act clearly indicate Congressional approval of Chief Judge George H. Moore's analysis of the Jencks decision, Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 in United States v. Anderson, D.C., 154 F.Supp. 374 (1957). Paraphrasing in part the Anderson decision language, which was for all practical purposes adopted by the Report, Judge

Moore held that a defendant's right to statement production would depend upon the government having called the witness and the defendant establishing " * * * on cross examination that a statement was made by such witness.", and " * * that such a statement is in (the) possession of the United States * * *."

In this light see the Legislative History quotation of language quoted with approval in Jencks which originally appeared in Gordon v. United States, 344 U.S. 414, 419, 73 S.Ct. 369, 97 L.Ed. 447, that a demand should be "for production of * * * *specific documents and did not propose any broad or blind fishing expedition* among documents possessed by the Government * * *" (emphasis from Legislative History).

■ There should be—indeed there is —an obligation on the defendant in the first instance to prove to the trial judge's satisfaction that there is a possibility that statements might exist as to a particular witness or witnesses. Absent such a showing in the trial court it hardly seems meet to for the first time in an appellate tribunal allege, unsupported by any evidence, that statements might exist. Surely such a "might" would be based upon improbability and not probability.

■ Usually the proper foundation is brought forth by the testimony of the government witness, if not on direct then on cross-examination. (See the first Campbell decision, Campbell v. United States, 365 U.S. 85, at p. 96, 81 S.Ct. 421, at p. 427, 5 L.Ed.2d 428, wherein the Court commented: "Moreover, the petitioners' cross-examination of Staula (the witness) had shown a *prima facie* case of their entitlement to a statement, * * *.") If the witness testifies that he signed or adopted a statement or that he was interviewed by a government agent and some record was made (the witness may not know the extent or exact nature of such a record) then the government would be obligated to produce the

and in an effort to avoid trial delay I would suggest that some thought and consideration be given to possibly amend-

ing the Act and removing the basis for any such objection were one to be made.

apparent applicable statement, or to the judge's satisfaction show that notwithstanding the witnesses testimony there is no such statement. At this point we have what I have already referred to as an "is it or is it not a statement" issue.

### Procedure for determining "Is It Or Is It Not a Statement"

Noticeably, the Act does not specifically provide for or mandate the procedural method a trial judge must employ and follow in making this very important statement determination. Notwithstanding there being no bases for it in the Jencks decision, the Act specifically provided for *in camera* inspection on government "not related" claims. I suggest that Congress, in failing to mandate a similar procedure as to statement determinations, wisely left to the courts' discretion the procedural methods to be employed in making such determinations. By so doing Congress relieved the courts of the Procrustean task of being required to review *seriatim* all of the papers and documents reposited in government files.

The Act's omission as to statement determination procedure is well appreciated by the Supreme Court. In Campbell "I" at p. 93, 81 S.Ct. at p. 426 the Court addressing itself to this statement issue quoted with approval its earlier language in Palermo v. United States, 360 U.S. 343, 354–355, 79 S.Ct. 1217, 3 L.Ed. 2d 1287.

"It is also the function of the trial judge to decide, in light of the circumstances of each case, what, if any, evidence extrinsic to the statement itself may or must be offered to prove the nature of the statement".

Again, as to recommended procedure in statement determinations, the Court in Palermo at p. 355, 79 S.Ct. at p. 1226 stated:

"This is a problem of the sound and fair administration of a criminal prosecution and its solution must be guided by the need, reflected in so much of our law of evidence, to avoid needless trial of collateral and con-fusing issues while assuring the utmost fairness to a criminal defendant."

The above quote was followed by a citation of Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Nardone, which was decided many years prior to the Act, concerned itself generally with the function, responsibility and authority of a trial judge in administering the procedure in criminal trials.

Following the language of the Court it becomes obvious that in determining whether a statement exists which has not properly been turned over, or if a particular document is a statement within the meaning of the Act, trial judges must be guided by the individual circumstances of the case before them—giving mind always to the spirit of the Act and the ever existing obligation to properly guarantee the accused his fundamental rights incident to trial.

Although in both Campbell "I" and Palermo the Court "approved" the practice of the trial judge's viewing the questionable documents *in camera* and his conducting a non-advisory inquiry, I submit, that the Court did not mandate such practice under all circumstances. (As I have already pointed out absent a proper foundation the trial judge could and would have no obligation.) Once a proper foundation has been made it is still possible that further testimony of the witness might be sufficient to justify a ruling by the judge, absent additional inquiry or *in camera* inspection, such a ruling (having avoided the "needless trial of collateral issues") could find the statement issue either affirmative or negative to the defendant's interests. Obviously such a ruling if against the defendant would have to be warranted and supported on the face of the record. In the words of the Supreme Court it could not be "clearly erroneous". (Campbell "II" —Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501).

If there is any doubt in the judge's mind or if the record unaided by further inquiry still suggests the possible exist-

ence of a non-produced statement then further inquiry and possible *in camera* inspection is required.[11] Such, as already indicated, is the method approved by the Supreme Court.

In Campbell "I" the Supreme Court offered several guide lines relative to the approved inquiry procedure. The inquiry, said the Court, was to be in the nature of a non-adversary proceeding with the judge calling the necessary witnesses without the presence of the jury. The Court also indicated its disapproval of the judge's calling as an inquiry witness for purposes of viewing a questionable document the Act witness. ("Reliance upon testimony of the witness based upon his inspection of the controverted document must be improper in almost any circumstances"—p. 97 of Campbell "I" in 365 U.S., p. 428 of 81 S.Ct.). Notably, the dissenting opinion at p. 106, 81 S.Ct. 421, fully agrees with the majority on this point and its "self interest" rationale.

### Statement Defined

██ Regardless of the procedure adopted the trial judge must determine whether or not the questionable document is or is not a statement within the meaning of the Act. In this regard the Act is quite helpful. Sub-section (e) of the Act in defining the term statement provides as follows:

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

Notwithstanding what appears for the most part to be sufficiently clear language [12] and a satisfactory definition it is in the interpretation of this subsection that the courts are most at odds. In my opinion the language of the Supreme Court as is the language of the subsection—has been quite unequivocal and clear in its literal interpretation of subsection (e).

### Subsection (e) (1) Statements

██ To satisfy the (e) (1) definition little seems to be required. If a witness called by the government has signed or otherwise adopted or approved a writing in the possession of the government such writing is a (e) (1) statement, and if "relevant" is producible.

In this regard it should be noted that subsection (e) (1) does not require the writing to have been made to or for an agent of the government, or that it be recorded contemporaneously, or that it be a substantially verbatim recital of what the witness orally stated.

11. Although *in camera* inspection is specifically and properly provided for as to what the government admits or the judge finds are statements within the meaning of the Act, I somewhat question the courts right, assuming what would be an unusual government objection, to order the government to produce documents not admitted or found to be statements. Such power in the courts would in effect permit judicial forays and incursions into executive files contrary to the spirit of our Constitutional separation of powers. That Congress felt as I do at the time it passed the Act is in-

dicated in the Legislative History of the Act at page 1868, where under the heading "Limitations of Jencks Decision" the following "lucid sound language" of Simms v. United States, 101 U.S.App. D.C. 304, 248 F.2d 626, 630 was quoted. "As a matter of fact the Court made amply clear the continued prohibition upon judical invasion of executive internal memoranda and reports."

12. Both subsections (1) and (2) in contravention of one of the most fundamental rules of proper definition make use of the word being defined i.e. statement —in defining.

Accepting this definition literally I find myself unable to agree with the non-statement determination made by my learned colleague Judge Will in United States v. Keig, 61 CR 220. I do feel, as obviously Judge Will felt, that Congress never intended the Act to apply to a situation such as the one presented to him, however, the expressed wording of the Act and its interpretation by the Supreme Court in Clancy v. United States, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 have, in my opinion, all but resolved this issue.

In Keig the Act (§ 3500) witness was an Internal Revenue Service Special Agent whose report relative to his interviews with the defendant were turned over. However, not so his "general report of the case". Defendant's counsel brought out the existence of such a general report on cross-examination. Request for turn over was denied, as was a subsequent request that the Judge review the report *in camera*. There was no claim by the Assistant United States Attorney that the report did not "relate to" the witness's testimony. Rather, the objection to disgorging this general report by the Assistant United States Attorney was based upon an apparent misunderstanding as to who was the Jencks Act witness, namely the Internal Revenue Service Agent and not the defendant.

The Internal Revenue Service agents report was not turned over; the judge obviously ruling that it was not a statement.

The Court of Appeals (United States v. Keig, 7 Cir., 320 F.2d 634) speaking through Judge Schnackenberg followed a course of action "acquiesced in" by government's counsel and remanded with directions "(1) to hold an inquiry, pursuant to the Jencks Act and consistent with this opinion, and (2) supplement the record with new findings."

I cannot help but feel that the Court of Appeals there as here was misguided by an Assistant United States Attorney.[13] There as here true advocacy was lacking inasmuch as both counsel agreed that the trial judge did not properly discharge his duty to administer the Act.[14] This absence of advocacy is, in my opinion, apparent in a reading of the decision. Although, as I have already indicated, I cannot agree with the legal correctness of Judge Will's ruling,[15] I can agree with the procedure he adopted to arrive at his ruling. On the basis of the testimony before him—i. e. that the Internal Revenue Service witness had himself prepared a report of the case—he could have and did decide the statement issue. I fail to see how further inquiry or an *in-camera* inspection, absent a non-related claim by the government, could or would be necessary to a proper ruling. There, as here, I feel Judge Will and the Court of Appeals have been put to unnecessary burden.

Having indicated my disagreement with Judge Will's substantive ruling I deem it necessary to recall the language of subsection (e) (1) and explain my position. Briefly, the Internal Revenue Service agent was a government witness, he himself wrote, probably signed and in any event adopted and approved, the report there in issue which admittedly was in the possession of the government. On the basis of such testimony I would, for that matter I have,[16] ruled such re-

---

13. See United States v. Sheer, 7 Cir., 278 F.2d 65 where the same Judge Schnackenberg benefited by a proper legal presentation of the facts and the law in a learned opinion cited and followed United States v. Berry, 7 Cir., 277 F.2d 826 and held that the (e) (1) statement definition did apply to government agents when called as trial witnesses. The case concerned "Internal Revenue Reports" prepared by the agent witnesses.

14. In justice to defendants' appellant counsel in the instant case it is my understanding that although, in discharge of their respective duties, they argued that my Act rulings were in error they object to the present remand.

15. On June 16, 1964, 334 F.2d 823, the Court of Appeals affirmed Judge Will and the Keig conviction.

16. Agent DuMaine in the instant case prepared a somewhat similar report of the

ports to be sub-section (e) (1) statements. I grant that, where as in Palermo, the government agent was not himself the witness, then there need be no turn-over order of (p. 353 of 360 U.S., p. 1225 of 79 S.Ct.) "* * * statements which contain the agent's interpretations or impressions". However, where the agent himself is called as a government witness, then statements containing his interpretations or impressions, albeit their being relevant to his testimony, would indeed appear to be a possible source of impeaching material.

I find it difficult to materially distinguish the facts in Keig from those in Clancy. Notably Clancy went to the Court on a writ of certiorari to our Seventh Circuit Court of Appeals. The witness in Clancy, as was the witness in Keig, were government agents. These agents testified at the trial that they interviewed the defendants. One agent (Mochel) took notes at the time of the interview. The other two agents (Minton and Buescher) took no interview notes. Minton further testified that although he took no notes at the time of the interview, he did, upon returning to his office, make "a memorandum of the interview". Buescher's testimony corresponded with Minton's with the exception that his memorandum was prepared from agent Mochel's interview notes.

The trial court ordered produced the interview notes of agent Mochel and denied, as not being Act statements, the agents' memorandum. (This ruling was apparently in part based upon a failure to properly appreciate the (e) (1) state-

ment definition.) Our Court of Appeals affirmed and the Supreme Court reversed.

The Court with little elaboration called attention to the fact that subsection (e) is further subdivided into (1) and (2); that these subsections are joined by an "or" and that the requirements of one are not the requirements of the other.[17] The memoranda were subsection (e) (1) statements said the Court.

Actually, even before Clancy was decided in the Supreme Court although subsequent to it having been decided in the Seventh Circuit (276 F.2d 617), our Court of Appeals speaking through its Chief, Judge Hastings, decided United States v. Berry, 7 Cir., 277 F.2d 826 in accordance with the later to be decided Supreme Court decision in Clancy. The court's decision was predicated upon an excellent and extensive analysis of both the statute and applicable case law relative to what it referred to as the government agent witness situation.

In Berry the witness was an undercover government narcotics agent who on cross examination testified that at his office subsequent to his investigations he prepared "a written report of the case" for the government. Defendant's motion to produce the report was denied by the trial judge.

The court expressed its approval with the Fourth Circuit case of Holmes v. United States, 271 F.2d 635 (1959), holding that written statements of a government agent employee within the (e) (1) definition of the Act are producible when the agent or employee is called as a government witness. At page 828 of 277 F.2d Judge Hastings said: "It cannot be seriously doubted that the report

case. Assistant United States Attorney Bittman, to his credit, did not contend that the report was not a statement, however, he did claim that in parts it did not "relate to" DuMaine's testimony. In accordance with subsection (c) of the Act, I inspected the document *in camera*. Subsequent to commenting generally on the document and for all practical purposes previewing my ruling, Mr. Bittman clairvoyantly and appropriately withdrew his "relevancy" objection and the statement was turned over to the defendants.

17. Factually it is quite possible that a particular writing—i. e. statement—could satisfy the requirements of both (1) and (2) of subsection (e). To this extent although their respective requirements differ they can and in fact do somewhat overlap. e.g. Witness narrates facts to government agent who contemporaneously causes its substantially verbatim stenographic recordation. After reducing the narration to writing it is reviewed by the witness and signed by him.

is covered by the definition found in Sub-section (e) (1) * * *". See also United States v. Sheer, 7 Cir., 278 F. 2d 65.

 In view of the wording of the Act and the decisions in Clancy and Berry it would appear that all papers or Campbell "II" "copies" thereof, written by a government witness himself or his amanuensis which are in the possession of the government are (e) (1) statements. In this relationship it should be observed and kept in mind that the government witness might be a government investigatory agent—i. e. Federal Bureau of Investigation or Internal Revenue Service Agents. Where the paper is not written by the witness himself but is later signed by the witness it also is an (e) (1) statement. Absent his having written or signed the paper it must appear that the witness "otherwise adopt or approve" the writing—we are now approaching a grey area. In this regard the Court in Campbell "II" has indicated its intention to somewhat liberally construe the "otherwise adopt or approve" requirement.[18]

### Subsection (e) (2) Statements

Subsection (e) (2) covers those situations where a witness has orally narrated information to a government agent which narration is recorded contemporaneously and substantially verbatim. Notably, under the provision of this subsection the witness need not have signed, approved or otherwise adopted the recordation.

 Although the Supreme Court has not yet had sufficient opportunity to fully consider many of the legal aspects of this subsection, a reading of the decided cases, for that matter a reading of the subsection itself, indicates the possible and probable areas that will be the subject matter of judicial concern. Determination as to the legal and factual meaning of the contemporaneously recorded and substantially verbatim requirements should be anticipated. Congress specifically included these requirements in definition (2) with the obvious intention of guaranteeing that such statements are the words of the witness and not an interpretation, summary or evaluation of the narration by the interviewing agent.[19] Inasmuch as the purpose of the Act is to afford defendants the opportunity to impeach government witnesses it naturally follows that any such impeachment should rightfully be predicated only on prior statements of the

18. The Court held the "adopt and approve" requirement satisfied where although the witness never read or viewed the wording of the writing its contents were substantially narrated back to him by his interviewer.

19. Palermo v. United States, 360 U.S. 343, at 352–353, 79 S.Ct. 1217, at 1224. "It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. (See, e.g., 103 Cong.Rec. 16739. See also many statements to the same effect in the House and Senate Reports.) It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on 'substantially verbatim recital,' and 'continuous, narrative statements made by the witness recorded verbatim, or nearly so * * *,' see Appendix B, post [p. 358, 79 S.Ct. page 1228] that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history (See legislative material cited and quoted in Appendix B, post, p. 358, 79 S.Ct. page 1227), and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions."

witness—not someone else's interpretation of a witnesses narration. For this reason we might anticipate strict adherence to these authenticity requirements by the Court. See however footnote #2 in United States v. Sheer, 278 F.2d 65, 67: " * * * the evidence indicates rather strongly that these reports were made so soon after those events that they were as a matter of fact contemporaneous therewith, * * * ".

Subsection (e) (2) poses still another question for interpretation—the scope of the term "government agent". I am personally of the opinion that at the time of its passage the Act was intended to include only investigatory agents of the government e. g. Federal Bureau of Investigation Agents, Internal Revenue Agents, etc. However, assuming the accuracy of my assumption, unfortunately, such a restricted interpretation of the terms "government agent" is not manifested by the language of the Act nor is it clearly borne out in the Congressional Record.

The problem then (one which apparently concerned the United States Attorney on appeal of the instant case) is whether or not a writing which would otherwise be a statement within the requirements of subsection (e) (2) is not such a statement if an Assistant United States Attorney is the recorder. Notwithstanding a representation to the contrary in the United States Attorney's brief in the Court of Appeals (p. 14), definite law in this area has not been established—at least not in this Circuit or in the Supreme Court. In this regard I cannot help but comment briefly on the two cases the United States Attorney's brief represents have "established" the law. United States v. Aviles, 2 Cir., 315 F.2d 186, remanded sub nom Evola v. United States, 375 U.S. 32, 84 S.Ct. 24, 11 L.Ed.2d 106 and Saunders v. United States, 114 U.S.App.D.C. 345, 316 F.2d 346. Saunders, the earlier of the two cases, was remanded back to the

district court for further Act proceedings. A government trial witness testified that he was interviewed by the Assistant United States Attorney who tried the case, who during the witnesses narration took notes.[20] Apparently without eliciting any further testimony or receiving any representation on the subject and without requesting the government to submit the so-called notes for *in camera* inspection, the trial judge denied the defendant's production motion on the ground that the notes constituted "work product" of the Assistant United States Attorney and as such were immune from production.

The Court of Appeals for the District of Columbia, speaking through Mr. Justice Reed, remanded. On appeal the United States Attorney's office, to its credit, argued the applicability of the work product disclosure exception in support of the trial judges ruling.

Parenthetically I interject the following comment. As I have attempted to make clear in this memorandum, unlike the trial judge in Saunders, I did not find that work product could be excepted from otherwise producible Act statements—for that matter no such issue was presented to me for determination. And, although I have in this memorandum indicated what at best could be categorized as my opinion of what the Supreme Court will do with this issue if and when it is presented to them, I cannot help but comment favorable on the stand taken by the United States Attorney's office in supporting the trial judge in Saunders. Inasmuch as the Act by its language did not foreclose the issue and it was at the time of appeal undecided in the Circuit, the art of advocacy and the law were properly served by having the issue argued and presented to the Court of Appeals. Under circumstances similar to Saunders and the instant cases, true advocacy as opposed to a confession of error, even assuming the confessor's personal belief

20. In accordance with my earlier discussion of applicable procedure it would appear that the defendant's attorney by his cross examination had laid the appropriate foundation and made necessary judicial action.

as to the existence of such error, is to be preferred and should be appreciated not only by the trial judge but by the bar as a whole.

The Court of Appeals in Saunders rejected the "work product" ruling and argument in support thereof. Although I would now express general agreement with the legal conclusion reached in Saunders—i. e. that a "work product" claim should not serve to except the production of documents which in all other respects are Act statements—I fail to understand and to that extent cannot agree with some of the decision's language. I refer to the language of the court indicating its belief that narrative statements taken from a witness by an Assistant United States Attorney would under no circumstances constitute attorney's work product.

At pages 349–350 the court stated " * * * it is possible to produce 'statements' taken down by an attorney, and still preserve the sanctity of the attorney's work product." Also at page 350: "But if the attorney has made only a substantially verbatim record of his interview, then, quite the contrary, his notes constitute a 'statement' and include no protected material flowing from the attorney's mental processes."

 I do not agree that the definition of work product is necessarily exclusive of the Act's definition of statement. For that matter, to the extent that the court in Saunders found such an inherent exclusion in these legal concepts, it in effect never decided the non-applicability, but rather, the inapplicability of a work product claim to Act statements.

I believe that the Supreme Court's definition of work product in Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 indicates the definite possibility that in statement-taking situations if the interviewing attorney asks

questions of the witness, to the extent that such questions and the answers thereto could and would reveal the ideas, mental impressions and theories of the attorney, they would be his work product.

Aviles, in affirming the two district court decisions appealed from (197 F. Supp. 536 and 200 F.Supp. 711), ruled in favor of the government, *a fortiori*, its comments on work product were *dicta*. In briefly commenting on work product and suggesting that it would not protect Act statements taken by an Assistant United States Attorney, the court cited Saunders. Of equal significance is the fact that one of the district court decisions affirmed (200 F.Supp. 711), gratuitously offered comments on the Act—work product relationship. The work product exception, suggested the district court at page 715, would not protect against the disclosure of Act statements taken in the "investigative stage * * * as distinguished from notes made in preparation for trial." By affirming, did the court in Aviles also intend to adopt this language or did it expressedly reject it as did Saunders?[21]

Although unable to agree with the unreserved statement in the United States Attorney's brief,[22] I do agree and have indicated I am of the opinion that when and if the Supreme Court—or our Seventh Circuit Court of Appeals—are properly presented this issue they will not give approbation to a work product claim interposed in an attempt to deny a criminal defendant that to which he would otherwise be entitled. However, notwithstanding my own personal belief and attempt at clairvoyance it would appear to me that the United States Attorney's office should welcome the opportunity when and if presented, to have this issue dispositively determined.

If I might digress for a moment apropos the work product—Act relation-

---

21. Saunders v. United States, 316 F.2d 346–350.

22. "Recent developments in the law concerning the scope of 18 U.S.C. 3500 have

established that such documents are no longer protected by the 'work product' rule of Hickman v. Taylor, 329 U.S. 495 [67 S.Ct. 385, 91 L.Ed. 451]."

ship issue I would suggest still another as yet judicially unconsidered however relevant esoteric relationship; that of the attorney-client privilege and the Act. Query, would a valid attorney-client privilege claim justify a government contention that it need not turn over an Act statement? Factually there are numerous hypothetical situations which might give rise to such an issue as to both subsection (e) (1) and (e) (2) statements.[23] An enterprising United States Attorney might find a practical procedural method by which this attorney-client privilege could be used to offset the harsh consequences heretofore commented on relative to the Clancy interpretation of (e) (1) statements.

In support of such a privilege claim the government might well consider the implications and possible analogy to be drawn from Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S. Ct. 1237, 3 L.Ed.2d 1323 (1959). In Pittsburgh Plate Glass Co. the Court condoned and gave its approval to the government's claiming still another privilege; the right to protect grand jury proceedings—i. e. its transcript—from disclosure. The Court held that the Act in no way relieved the one seeking production of grand jury testimony from establishing to the judge's satisfaction a "particularized need" for such information.

The decision was predicated upon the Court's finding "that Congress intended to exclude those minutes from the operation of the so-called Jencks Act, 71 Stat. 595, 18 U.S.C. (Supp. V, 1958) § 3500". Following this quote the Court cited the Congressional Record as follows: "See S.Rep. No. 981, 85th Cong., 1st Sess; 103 Cong.Rec. 15933". The Court also relied on its related grand

jury decisions and Rule 6(e) of the Federal Rules of Criminal Procedure.

Significantly the grand jury privilege is not specifically excepted in the Act notwithstanding the fact that its protection might extend to what would otherwise be Act statements. So also the attorney-client privilege? Recall that the grand jury and attorney-client privileges are considered traditional privileges having their genesis in early common law, as distinguished from the work product exception which is more generally felt to have been born in Hickman and in any event must fall in the face of a "good cause" showing by the party seeking production. The Legislative History at page 1862 also contains the following appropriate language indicating an intent on the part of Congress that the Act not apply to " * * * any matters which are within a valid exclusionary rule." The Jencks decision (p. 667), is also quoted as excepting matters within "any exclusionary rule."

## THE "RELATED TO" ISSUE

 To be distinguished from the initial "is it or is it not a statement" issue is the Act's "related to" issue. Subsection (c) of the Act concerns itself with this subject. The subsection is clear and for the most part requires little comment beyond noting its distinct existence in the Act. Notably, the Act itself mandates the trial procedure that *must* be followed when and if the government claims that, either what it admits or the judge has found to be a statement, "does not relate to the subject matter of the testimony[24] of the witness."

As spelled out in the Act the judge makes an *in camera* determination as to a statement's relatedness. If it is

23. A government investigatory agent who is later called as a government trial witness might, in aid of a request for legal advice and suggestions as to further work deemed necessary, submit in writing a summary of his investigation to the United States Attorney.

24. Somewhere along the line courts have equated this to mean and be limited to

direct testimony. Such a limitation would appear to be contrary to the purpose of the Act. To the extent that "related to" might have a broader and more liberal meaning than the traditional evidentiary term "relevant to" this distinction would be of importance.

found to be related to the witnesses' testimony the statement is turned over to the defendant and the matter is at an end. On the other hand, those portions or the entire statement, as the case may be, that are deemed non-related are excised and only the related portions, if any, are turned over. Statements or portions thereof which are excised and not made available to the defendant are sealed and upon an appeal are delivered to the Court of Appeals.

 Appreciating the Congressional purpose behind subsection (c)—i. e. to preclude defendants from embarking on fishing expeditions through government files—still, inasmuch as the defendant would have no opportunity to rationally argue against a non-related finding, a very liberal interpretation of the cognomen "related" should be used.[25] As a practical matter it is somewhat difficult to envision many statements concerning the case at bar that would not in some way "relate to" the witnesses' testimony.

### DESTRUCTION—THE "GOOD FAITH" RULE

On this point I need only call attention to Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). The case arose from our district and generally concerns a conviction for falsely swearing non-affiliation with the Communist Party to the National Labor Relations Board. The appeal was premised on two grounds, one related to Act statements and the other concerning instructions to the jury, the latter of which is not salient to this memorandum.

The "witnesses" were two Federal Bureau of Investigation plants or informers who had been working within the Communist Party. After their direct testimony some Act statements were turned over to the defendant, however, on cross-examination both specifically testified that they signed *receipts* for

the Federal Bureau of Investigation as to money received to cover their expenses. Also, one witness specifically testified (again on cross-examination) that Federal Bureau of Investigation Agents took *notes* as he orally related his expenses. Notwithstanding an Act motion to produce neither the *receipts* nor *notes* were ordered turned over by the trial judge. The Assistant United States Attorney opposed defendant's motion on the following grounds: (1) that the *notes* and the *receipts* did not relate to the direct testimony of the witnesses and (2) that the *notes* were administrative records and immaterial and irrelevant.

Contention (2) above was so patently meritless on its face that it deserved no comment as to its inapplicability— the Supreme Court did not even consider it. Contention No. (1), on the other hand, in that it concerned itself with a "related to" issue created the obvious sub-section (c) *in camera* inspection situation. Such an inspection was not conducted.

In the Supreme Court the Solicitor General in effect confessed error by making the following arguments:

A—as to the *Receipts*:

They are Act statements, however, they do not "relate to" the witness's testimony with the exception of two such receipts in which, although acknowledgedly they do relate, their information was turned over in even greater detail in the statements that were produced to the defendant.

B—as to the *Notes*:

They may have been Act statements, however, they were not in existence at the time of the trial having been destroyed by the Federal Bureau of Investigation in accordance with its normal practice. The Solicitor General gratuitously acknowledged that this representation of his need not be accepted by the petitioner.

25. See United States v. Cardillo, 316 F.2d 606, cert. den. 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55, and United States v. Simmons, 281 F.2d 354, aff'd en banc, 281 F. 2d 360, Second Circuit cases somewhat contrary to this view.

The Court in considering these arguments held as follows:

A—as to *Receipts*:

(1) The Government's contention that they do not *relate* can only be determined by a trial court *in camera* hearing.

(2) The Government's contention, as to the two relating documents, that the information they contain was possessed by the defense counsel and therefore its omission to produce was "harmless error" (Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304), can only be factually decided by the trial judge.

B—as to the *Notes*:

The Court rejected the defendant appellant's "destruction per se error" argument, to wit, that the mere fact of destroying an Act statement precludes a fair trial. In this regard at page 242 of 368 U.S., at page 308 of 82 S.Ct., the Court states: "If the agent's notes of Ondrejka's oral reports of expenses were made only for the purpose of transfering data thereon to the receipts to be signed by Ondrejka, and if, after having served that purpose, they were destroyed by the agents in good faith and in accordance with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right."

Inferentially, from this language we can conclude that the fact of destruction can be offset by a showing of *good faith*. What constitutes good faith will for the most part depend upon the individual circumstances of the case, and once determined a trial judge's ruling which is benefited by the presence of the witnesses at the time they testify should not be reversed absent it being held to be "clearly erroneous".

Unquestionably many things go into and contribute to a judge's making such a determination. Most important is the testimony of the witness who caused the destruction—his character and his apparent motives. Also, as I have already indicated earlier in this memorandum, if the information contained in the destroyed statement, or better a Campbell "II" copy of the destroyed statement, is made available to the defendant such a fact would substantially support a finding of good faith destruction. Directly on point is the following language contained in a most recent opinion written by Judge Swygert. United States v. Spatuzza, 7 Cir., 331 F.2d 214, 218:

"Defendants complain that enforcement of section 3500 was thwarted when the FBI agents destroyed notes taken during interviews with witnesses. The agents testified, however, that the reports furnished defendants accurately reflected these notes and all the information contained in the notes was included in the reports.

"Defendants did not demand production of the notes; rather, they were concerned with the circumstances of their destruction. Without a request for production, no issue was presented for the district judge to rule upon. Moreover, in our opinion, section 3500 does not require government agents to preserve their notes after they have been transcribed and the reports checked for accuracy. United States v. Greco, 298 F.2d 247 (2d Cir.), cert. denied, 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962)."

I sincerely hope my foregoing review will be of some assistance to counsel in future cases in my court. Having of necessity herein conducted the extensive research indicated I felt it not too presumptuous to at least record the results thereof.